IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

TRI-STATE INSURANCE COMPANY OF MINNESOTA,

        Plaintiff,

v.

JACOBSEN BROTHERS PAINTING, INC.,

        Defendant.

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff, Tri-State Insurance Company of Minnesota ("Tri-State"), through its below-signed counsel, pursuant to the Declaratory Judgment Act, as codified, 28 U.S.C. § 2201, and F.R.C.P. 15, 38, 39, and 57, hereby submits its Complaint for Declaratory Relief, stating as follows:

## NATURE OF THE ACTION

1. This is an insurance coverage action, which arises in connection with a property damage clam brought by Defendant Jacobsen Brothers Painting, Inc. ("Jacobsen"). Plaintiff, Tri-State, brings this action for declaratory relief due to Jacobsen's breaches of the insurance policy—including by failing to cooperate with Tri-State's investigation of the claim and failing to provide a sworn statement in proof of loss—which have prejudiced Tri-State's ability to investigate and resolve the claim, as well as Jacobsen's insistence on proceeding with appraisal while refusing to do so in a manner that is consistent with current Colorado law. In light of

Jacobsen's conduct and breaches of the insurance policy, Tri-State seeks a judicial determination and a declaration of the rights and obligations of the parties, as more fully described herein.

## PARTIES, JURISDICTION, AND VENUE

2. Plaintiff, Tri-State, is domiciled in the State of Iowa, and has its principal place of business in the State of Iowa.

3. Jacobsen is a resident of the State of Colorado and is headquartered in Colorado.

4. The amount in controversy exceeds $75,000.

5. This Court has jurisdiction under 28 U.S.C. § 1332 and 28 U.S.C. § 2201.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Jacobsen is a company organized in Colorado, and the events giving rise to Jacobsen's property damage claim, and the adjustment thereof, occurred in this District. Venue in this District is also appropriate because this action addresses an insurance dispute involving a contract negotiated and issued in Colorado, regarding alleged property damage that occurred in Colorado.

## FACTS

**The Insurance Policy**

7. Tri-State issued a policy of insurance to Jacobsen, number 3127887-23, with an effective date of 04/01/2019 and an expiration date of 04/01/2020 (the "Policy").

8. The Policy provided property insurance, subject to certain terms and conditions, for Jacobsen's property located at 1218 Commerce Ct., Lafayette, CO 80026-9536 (the "Property").

9. Among other terms and conditions, the Policy contained an endorsement that specified as follows:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**LIMITATIONS ON COVERAGE FOR ROOF SURFACING**

This endorsement modifies insurance provided under the following:

BUILDERS RISK COVERAGE FORM
BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY

**SCHEDULE**

| Premises Number | Building Number | Indicate Applicability (Paragraph A. and/or Paragraph B.) |
|---|---|---|
| 1 | 1 | Paragraph B |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | |

**A.** The following applies with respect to loss or damage by a **Covered Cause of Loss (including wind and hail if covered)** to a building or structure identified in the Schedule as being subject to this Paragraph **A.:**

Replacement Cost coverage (if otherwise applicable to such property) does not apply to roof surfacing. Instead, we will determine the value of roof surfacing at actual cash value as of the time of loss or damage.

**B.** The following applies with respect to loss or damage by **wind and/or hail** to a building or structure identified in the Schedule as being subject to this Paragraph **B.:**

We will not pay for cosmetic damage to roof surfacing caused by wind and/or hail. For the purpose of this endorsement, cosmetic damage means that the wind and/or hail caused marring, pitting or other superficial damage that altered the appearance of the roof surfacing, but such damage does not prevent the roof from continuing to function as a barrier to entrance of the elements to the same extent as it did before the cosmetic damage occurred.

**C.** For the purpose of this endorsement, roof surfacing refers to the shingles, tiles, cladding, metal or synthetic sheeting or similar materials covering the roof and includes all materials used in securing the roof surface and all

materials applied to or under the roof surface for moisture protection, as well as roof flashing.

10. Among other terms and conditions, the Policy contained an endorsement that provides in pertinent part as follows:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**EXCLUSION – COSMETIC DAMAGE TO BUILDING SIDING, TRIM, GUTTERS AND DOWNSPOUTS**

**A.** The following applies with respect to loss or damage by wind and/or hail to a building or structure identified in the Schedule:

We will not pay for cosmetic damage to "building siding", trim, gutters or downspouts attached to the external wall of the building caused by wind and/or hail. For the purpose of this endorsement, cosmetic damage means that the wind and/or hail caused marring, pitting or other superficial damage that altered the appearance of the "building siding", trim, gutters or downspouts, but such damage does not prevent the "building siding", trim, gutters or downspouts from continuing to function as a barrier to entrance of the elements to the same extent as it did before the cosmetic damage occurred.

**B.** The following definitions are added to the **Definitions** Section:

"Building siding" means all materials used to cover the outside structure of the building including, but not limited to, vinyl siding, steel siding, steel panels, wood clapboard, shingle siding, fiber cement siding, stucco, engineered wood siding, aluminum siding or stainless steel siding to keep out the elements. "Building siding" includes all materials used in securing the siding surface and all materials applied to or under the siding surface for moisture protection, as well as flashing.

11. Among other terms and conditions, the Policy sets forth the duties of the insured in the event of loss or damage. As pertinent here, the Policy specifies as follows:

**3. Duties In The Event Of Loss Or Damage**
   **a.** You must see that the following are done in the event of loss or damage to Covered Property:

4

. . .

    **(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

    **(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

    **(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

    **(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

    **(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

    Also, permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

    **(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

    **(8)** Cooperate with us in the investigation or settlement of the claim.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

12. The Policy also contains an appraisal provision, which states as follows:

**2. Appraisal**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be

5

> made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:
>
> **a.** Pay its chosen appraiser; and
>
> **b.** Bear the other expenses of the appraisal and umpire equally.
>
> If there is an appraisal, we will still retain our right to deny the claim.

13. This Court has repeatedly held that appraisal includes determining whether the loss was caused by the hail. *See Travelers Indemnity Co. v. BonBeck Parker, LLC*, 2016 WL 7733000, at *3–5 (D. Colo. Oct. 24, 2016), *aff'd*, 20-1192, 2021 WL 4484900 (10th Cir. Oct. 1, 2021); *Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n*, 100 F. Supp. 3d 1099, 1102 (D. Colo. 2015); *PB Prop. Holdings, LLC v. Auto-Owners Ins. Co.*, 16-cv-1748-WJM-STV, 2017 WL 7726696, at *3 (D. Colo. Jan. 26, 2017).

14. Hence, damage caused by hail that is only cosmetic in nature is not a "loss" under the Policy, as such loss is not covered per the provisions cited above.

### The Hail Claim

15. On October 31, 2019, Jacobsen made a claim under the Policy for alleged hail damage to the Property from a storm allegedly occurring on July 5, 2019 (the "Claim"). Jacobsen reported damage to the exterior of the Property, including the roof.

16. Continental Western Group ("CWG"), on behalf of Tri-State, has investigated, adjusted and paid the Claim.

17. In response to the Claim, CWG dispatched Team One Adjusting Services, LLC, to inspect the alleged loss, if any, to the Property, which inspection occurred on or about November 11, 2019. Team One determined that the Property did not sustain any covered loss.

6

18. On or about March 11, 2020, Jacobsen, through a Florida-based public adjuster, Michael Michio of Claims Adjusting Group, Inc. ("Michio"), introduced himself to Continental Western Group as the representative of Jacobsen on the claim.

19. On April 8, 2020, CWG responded to Mr. Adrian Enriquez ("Enriquez") of Claim Adjusters Group, Inc., confirming, among other things, that he was the authorized agent for Jacobsen in connection with the Claim.

20. Michio and Enriquez (collectively, the "Public Adjusters") are in fact public adjusters, authorized to act as the agents for Jacobsen related to the Claim.

21. Also on April 8, 2020, CWG specifically emphasized in writing that Jacobsen had certain duties under the Policy in the event of a loss or damage – including, among other things, cooperating in the investigation of the loss by providing documentation related to the loss.

22. On or about April 21, 2020, Jacobsen, through its Florida-based public adjusters, created an Xactimate estimate for the Claim purporting to show hail damage to the Property in the amount of $277,410.00 (The "Michio Estimate").

23. The Michio Estimate represented, among other things, that a new metallic roof was necessary, new HVAC, metal structures, siding, and more than $48,000 in overhead and profit.

24. CWG hired Haag Engineering, Mr. Matt Sitzmann, P.E., to inspect the alleged loss as represented by Michio, as agent for Jacobsen. Mr. Sitzmann concluded in part that numerous hail storms had occurred in the area of the Property since its construction in 1998.

25. Mr. Sitzmann also concluded that "hail had not done anything to the metal roofing panels to compromise their performance or longevity. Hail had not torn the roofing panels, opened the seams, or unseated fasteners."

26. Mr. Sitzmann also concluded that "Hail fractured elastomeric coating that had been applied over caulking at seams between roofing panels and at fasteners. The coating was previously cracked due to thermal-induced movement between the panels and between panels and fasteners. The fasteners and seams can be recoated."

27. Mr. Sitzmann also concluded that "Hail dented vent caps and fins of two condenser units. The vent caps will continue to perform as intended and could be left in place. The extent of fin denting in the two condenser units was such that combing may not completely restore their performance. To ensure complete restoration would require replacing those two units."

28. Mr. Sitzmann also concluded that "Water reportedly leaked in multiple locations. The leaks were due to inadequate flashing construction, wear and tear, and incomplete seams between sections of gutter. The leaks were not due to hail."

29. Mr. Sitzmann also concluded that "The roofing panels had many creases and buckles in their major ribs from foot traffic and/or handling. The metallic coating on panels was worn from age."

30. In a supplemental report dated June 19, 2020, Mr. Sitzmann identified which components of the Property sustained merely cosmetic damage, as defined by the cosmetic endorsements set forth above.

31. CWG reasonably relied on the Haag engineering report in adjusting the claim.

8

32. CWG also independently determined generally, through its investigation, that the roof was leaking prior to the alleged Date of Loss.

33. CWG, in reliance on the terms of the policy, including the siding and roofing cosmetic endorsements set forth above, made coverage decisions on the claim.

34. To resolve the Claim, CWG issued ACV checks to Jacobsen in the total amount of $72,768.52, which represents the actual cash value for repairs to the damaged property, as well as the depreciation for those items where repairs were completed, less the Policy deductible of $5,000.00.

35. Jacobsen, through its public adjusters, apparently maintained that the metallic roof and other items were covered under the Policy, regardless of the endorsements limiting coverage to non-cosmetic damage.

**CWG's Demand for a Sworn Proof of Loss:**

36. CWG believes the Michio Estimate is incorrect and inflated relative to the damage at the Property that is actually covered under the Policy.

37. On May 4, 2020, CWG mailed the Public Adjusters a form Sworn Statement in Proof of Loss document, along with a letter which requested, *inter alia*, that the Sworn Statement in Proof of Loss document be fully completed, properly executed and returned to CWG.

38. Jacobsen failed to return the signed, sworn proof of loss containing the information requested by CWG within 60 days, as required by the Policy.

39. CWG has made numerous requests for the Sworn Proof of Loss.

40. On or about August 5, 2020, CWG again gave Jacobsen and its Public Adjusters 60 days to cure the failure to submit a complete, executed, statement in sworn proof of loss.

41. Jacobsen failed to cure the failure to provide a Sworn Proof of Loss, despite being given 60 days to do so.

42. On December 15, 2020, Jacobsen, through the Public Adjusters, submitted a document titled "Sworn Statement in Proof of Loss – Building ONLY" to CWG. The document was not the same form Sworn Statement in Proof of Loss document that was provided by CWG.

43. The December 15, 2020 document provided by Jacobsen, through the Public Adjusters, states inconsistent dates of loss. The document also fails to provide any Replacement Cost ("RCV"), depreciation, or Actual Cash Value ("ACV") amounts, but rather it only states that such totals are "Amount To Be Determined."

44. On or about December 21, 2020, CWG sent a letter to Jacobsen and the Public Adjusters which identified the issues with the December 15, 2020 purported proof of loss document, including those set forth above, and explained that the document could not be accepted.

45. To date, Jacobsen and the Public Adjusters have refused to provide a complete and executed Sworn Statement in Proof of Loss containing all of the information requested by CWG, including the RCV, depreciation, or ACV amounts.

**The Requests for Documents**

46. Throughout the claim process, CWG made multiple requests for documents and information necessary to its investigation of the Claim, including documents related to repairs, maintenance, and related contracts.

47. CWG made requests for documents and information necessary to its investigation of the Claim through numerous letters sent to Jacobsen and the Public Adjusters, including

letters sent on April 8, 2020, May 4, 2020, May 14, 2020, July 1, 2020, July 16, 2020, August 5, 2020, October 2, 2020, November 24, 2020, December 10, 2020, and December 21, 2020.

48.     Despite these multiple requests for documents and information, Jacobsen and its agents refused to comply.

49.     Having not received the requested documents and information, on or about August 5, 2020, CWG sent Jacobsen and the Public Adjusters a letter, which again reiterated CWG's request for documents and information, notified Jacobsen that its failure to provide the requested documents and information was a breach of the policy, and provided Jacobsen with 60 days to cure the failure to provide the requested documents and information.

50.     Jacobsen failed to cure the failure to provide documents.

51.     In an effort to further its investigation, CWG requested that Jacobsen submit to an examination under oath ("EUO") as required by the Policy.

52.     Jacobsen's EUO took place on May 5, 2021.

53.     During the EUO, Jacobsen testified to being in possession of numerous documents, including those related to repairs and maintenance, which CWG had requested in writing no less than 10 times.

54.     Jacobsen did not bring those previously requested documents to the EUO and was unable to testify as to any specific information contained in those documents.

**Jacobsen's Ongoing Breaches of the Policy**

55.     CWG has repeatedly alerted Jacobsen and its Public Adjusters to its various duties under the Policy related to its Claim, including the duty to cooperate and the duty to provide records.

56. As discussed above, on August 5, 2020, CWG reminded Jacobsen of its duty to cooperate as required by the Policy, including the duty to provide requested documents and information and a fully executed Sworn Statement in Proof of Loss, and provided Jacobsen with 60 days to cure its failure to do so.

57. On October 2, 2020, CWG wrote to Jacobsen and its agents, Michio and Enriquez, recounting the repeated efforts to secure Jacobsen's compliance with the policy. CWG wrote, in part:

> ". . . we note that the insured, and you as their agent, have failed to cooperate with Tri-State Insurance Company of Minnesota (The Company) in our investigation of this claim. Several of the items requested in our previous correspondences of April 8, 2020, May 4, 2020, May 14, 2020, July 1, 2020, July 16, 2020 and August 5, 2020 and have gone unanswered."

58. The October 2, 2020 letter recounted in detail the items of information that CWG repeatedly requested from Jacobsen, Michio, and Enriquez in the past, including, for example: maintenance records on the Property, inspection records, description of where water intrusion existed, any video and audio of recordings that Michio made during inspections.

59. The October 2, 2020 letter again reiterated that the Proof of Loss had not been received, and specifically noted that the failure to provide the proof of loss "is not only a violation of a term of the policy, but also hinders our ability to assess your claim and respond appropriately."

60. The October 2, 2020 letter again specifically requested the Proof of Loss.

61. By letters sent to Jacobsen and its Public Adjusters on November 24, 2020, December 10, 2020 and December 21, 2020, CWG again recounted Jacobsen's breaches of the

Policy and reiterated its requests for documents, information, and a fully executed Sworn Statement in Proof of Loss.

62. As in the past, Jacobsen and its agents have refused to comply with the Policy and related requests.

**Appraisal**

63. Rather than comply with the requests by Tri-State and cure its non-cooperation, Jacobsen demanded appraisal under the policy on September 15, 2020.

64. Tri-State agreed to go to appraisal, subject to receiving more information, documentation, a Sworn Proof of Loss, and an EUO, all as more fully described above.

65. CWG has requested, before going to appraisal, a description of exactly what is to be appraised. But Jacobsen and its agents have declined, in breach of the Policy.

66. In numerous letters, CWG explained to Jacobsen and its agents that, in light of the cosmetic endorsements described above, and in order for the appraisal to be meaningful, the appraisal should proceed in a way that causation can be assessed; i.e., each chosen appraiser will need to answer the question of whether hail from the date of loss caused damage greater than cosmetic.

67. Proceeding with appraisal in this manner would ensure a meaningful appraisal under the Policy, and is consistent with current Colorado law, as repeatedly held by this Court.

68. Despite numerous and specific requests, Jacobsen and its agents have refused to agree to proceed with the appraisal in a way that addresses the issue of causation relative to the cosmetic endorsements; i.e., agree that for the appraisal to be meaningful, the panel must assess the degree to which the alleged storm damage exceed cosmetic.

69. In light of its breaches and conduct described above, Tri-State believes Jacobsen has forfeited its right to appraisal by failing to comply with the terms and conditions of the Policy.

## FIRST CLAIM FOR RELIEF

*(Declaratory Judgment Against Jacobsen)*

70. Tri-State incorporates by this reference the allegations set forth above.

71. There is a real, substantial, and justifiable issue in controversy between the parties hereto with respect to insurance coverage under the Policy. 28 U.S.C § 2201.

72. This is an action for, *inter alia*, declaratory judgment pursuant to 28 U.S.C. § 2201 for the purpose of determining a question in actual controversy between the parties.

73. A judicial determination and a declaration of the rights and obligations of the parties are necessary and appropriate at this time.

74. Jacobson directly and through its agents – the Public Adjusters – has breached the Policy and the covenant of good faith and fair dealing. The breaches include, *inter alia*, failure to submit a proof of loss, failure to cooperate, and failure to provide documents and information, all as required by the Policy and specifically requested by Tri-State.

75. These breaches have materially and substantially disadvantaged and prejudiced Tri-State, particularly in its ability to: investigate the Claim, determine the veracity of the alleged losses, assess what is covered in light of the endorsements limiting certain losses to non-cosmetic damage, and obtain details of the alleged loss.

76. Jacobsen and its agents were given multiple opportunities to comply with the policy and otherwise cure the non-cooperation, under C.R.S. § 10-3-1118, which they failed to do.

77. In light of the numerous violations of the Policy as described above, Tri-State is entitled to a declaratory judgment that Jacobsen has breached the Policy, has failed to comply with conditions precedent, and is not in full compliance with the Policy's terms. Consequently, Tri-State owes no further amounts under the Policy for the Claim to or on behalf of Jacobsen.

78. Tri-State also seeks a declaratory judgment declaring that it is not obligated to proceed to appraisal under the specific facts presented by this case and in light of the terms of the Policy and applicable law.

## SECOND CLAIM FOR RELIEF

*(Alternatively, Declaratory Judgment that Tri-State has Satisfied its Obligations under the Policy and Paid for All Covered Damages)*

79. Tri-State incorporates by this reference the allegations set forth above.

80. The Policy does not provide coverage for certain items of damage claimed by Jacobsen, for a number of reasons, including coverage limitations and exclusionary language in the Policy.

81. Specifically, the Policy does not provide coverage for damages that are merely cosmetic, as defined by the cosmetic endorsements.

82. The second report promulgated by Mr. Sitzmann during the investigation of the Claim explains that the effect of the Storm on the Property's metal roofing panels, coping, vents, ventilation equipment, siding panels, siding trim, gutters and downspouts, and window through-

wall flashing, are solely cosmetic as defined by the applicable cosmetic endorsements. Such items are not covered by the Policy.

83. Mr. Sitzmann also identified those components of the Property which sustained damage that were more than cosmetic. Tri-State has paid the full amount of insurance benefits owed for all such covered damages.

84. No other engineering reports were ever promulgated which rebut Mr. Sitzmann's conclusions. Nevertheless, Jacobsen is seeking insurance benefits for alleged damage to the metal roofing panels, coping, vents, ventilation equipment, siding panels, siding trim, gutters and downspouts, and window through-wall flashing.

85. Such areas of alleged damage are excluded by the Policy's cosmetic endorsements. Thus, the scope of damage claimed by Jacobsen is erroneous and exceeds that which is covered under the Policy.

86. Tri-State seeks a judgment that it is obligated only to provide insurance coverage and benefits for damage to property that is actually covered under the Policy, if any; that it has fully satisfied its obligations to provide insurance coverage on the Claim by paying for all covered damages; and that repair or replacement of metal roofing panels, coping, vents, ventilation equipment, siding panels, siding trim, gutters and downspouts, and window through-wall flashing is not required under the Policy, is in contravention of the clear language of the Policy, and would contravene public policy.

WHEREFORE, Tri-State respectfully requires that the Court enter a declaratory judgment in its favor and against Jacobsen, finding that Tri-State owes no further amounts on the Claim.

## THIRD CLAIM FOR RELIEF

*(Alternatively, Declaratory Judgment as to the Appraisal Process)*

87. Tri-State incorporates by this reference the allegations set forth above.

88. In the event the Court determines that appraisal is still appropriate, Tri-State requests an order that Jacobsen first comply with the policy by submitting a completed and final sworn proof of loss, and provide the information requested by Tri-State – all as required by the policy. Any participation in appraisal will be subject to Tri-State's right to contest coverage in court under the Policy, including but not limited to, for the reasons set forth in this Complaint.

89. Under the current state of law in Colorado, appraisals may address issues of causation. *See BonBeck Parker, LLC v. Travelers Indem. Co. of Am.*, 20-1192, 2021 WL 4484900, at *5-9 (10th Cir. Oct. 1, 2021); *Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n*, 100 F. Supp. 3d 1099, 1102 (D. Colo. 2015); *PB Prop. Holdings, LLC v. Auto-Owners Ins. Co.*, 16-CV-1748-WJM-STV, 2017 WL 7726696, at *3 (D. Colo. Jan. 26, 2017).

90. As set forth above, the Policy contains two cosmetic endorsements – "Limitations on Coverage for Roof Surfacing" and "Exclusion – Cosmetic Damage To Building Siding, Trim, Gutters And Downspouts" – which apply to the Claim.

91. In light of the cosmetic endorsements, and in order for an appraisal to be meaningful, the appraisal panel must address the amount of loss, if any, that is in excess of cosmetic loss under the cosmetic endorsements. In other words, the appraisal panel must determine the extent to which the subject Storm caused damage that was more-than-cosmetic. Only in that regard could an appraisal of the Claim be meaningful.

92.     Accordingly, in the event the Court determines that appraisal is still appropriate, Tri-State further requests an order that such appraisal proceed in the manner described above.

## PRAYER FOR RELIEF

WHEREFORE, Tri-State respectfully asks this Court to enter a declaratory judgment in its favor and against Jacobsen, to include the following relief:

(1)     a declaration that Jacobsen, directly and through its authorized agents, has breached the policy of insurance and, consequently, any further coverage or benefits under the policy related to the Claim, including any obligation to participate in appraisal, has been vitiated;

(2)     alternatively, a declaration that, if any coverage exists, Tri-State has fully paid for all covered damages;

(3)     alternatively, if the Court determines that Tri-State is required to participate in appraisal, a declaration that:

  (a)   Jacobsen must first comply with the Policy by providing a final and fully completed sworn proof of loss on the form provided by Tri-State as called for by the Policy, and

  (b)   the appraisal panel must address the amount of loss, if any, that is in excess of cosmetic loss under the cosmetic endorsements; and

(4)     a judgment for such other and further relief as the Court deems just and proper under the circumstances.

Dated:  October 8, 2021	Respectfully submitted,

*s/ Terence M. Ridley*
Terence M. Ridley
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, CO 80203
Telephone:	303.839.3800
Facsimile:	303.839.3838
Email:   tridley@spencerfane.com

Attorney for Plaintiff,
Tri-State Insurance Company of Minnesota